In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-2135

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TYRONE MAXWELL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cr-30049 — **Sue E. Myerscough**, *Judge.*

ARGUED SEPTEMBER 14, 2023 — DECIDED NOVEMBER 13, 2023

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* During a warrantless search of Tyrone Maxwell's apartment, police found evidence of illegal drug activity. That evidence was seized, and he was charged with various drug-related crimes. Maxwell moved to suppress that evidence, arguing that the search was not justified by exigent circumstances and the officers' manner of entry was unreasonable. The district court denied the motion and

Maxwell conditionally pleaded guilty. He now appeals, arguing the search violated the Fourth Amendment.

When the police entered Maxwell's apartment, they had an objectively reasonable basis for believing someone was injured inside, their entrance did not cause excessive or unnecessary damage, and they searched only in places where an injured person could be. Maxwell's motion to suppress the evidence police obtained was thus properly denied.

# I

On an August afternoon in 2019, two men approached a secured apartment building in Springfield, Illinois, buzzed a neighboring unit, and explained they were trying to contact Apartment 7's resident. Neighbors let them in but moments later heard gunshots. The two men fled and neighbors called 9-1-1. When police officers arrived, they saw bullet holes in Apartment 7's front door, shell casings on the stairs, and an empty gun holster.

Considering whether someone may be inside Apartment 7 who was injured or needed assistance, the officers called an ambulance and tried to make contact with anyone inside. Hearing no response, they attempted to open the door manually. When that was unsuccessful, they used a sledgehammer. That implement dented the doorknob, fractured the door, splintered the doorjamb, and overcame the deadbolt, allowing entry. From the officers' arrival to this point, ten minutes had passed.

Police opened the door and immediately smelled raw cannabis and saw loose cannabis. Springfield Police Sergeant Grant Barksdale, the responding officer in charge, turned left down a hallway which led to a bedroom. He entered the room

and saw a closet large enough to fit a person. When he opened the closet door he found more cannabis. Returning to the living room, he found another large closet. He opened that door, pushed aside some hanging clothes, and found a rifle. Police also saw a money counter sitting on a living room table.

The search lasted no more than ninety seconds.[1] After some time, Tyrone Maxwell arrived and police determined that it was his apartment. The officers sought and received a search warrant based on what they found in and outside the apartment. During the subsequent search, they found a total of two guns, more than ten pounds of marijuana, and more than $75,000 in cash.

A grand jury indicted Maxwell on three crimes: possession of marijuana with intent to distribute, possession of firearms in furtherance of a drug trafficking crime, and possession of firearms as a felon. He moved to suppress the evidence seized during the searches before and after the warrant was issued. Maxwell argued the police did not face an emergency justifying a warrantless entry.

The magistrate judge held an evidentiary hearing at which Barksdale testified. After the hearing the parties submitted supplemental briefs. Maxwell again argued that no exigent circumstance warranted entry. He also urged that officers acted unreasonably by using the sledgehammer, the officers' view from the open door dispelled any exigency, and their search of the apartment was unreasonable. After the supplemental briefing, the magistrate judge recommended that the district court deny Maxwell's motion. Maxwell objected to the

---

[1] Testifying at the suppression hearing, Barksdale estimated that the search was "maybe a minute, minute and a half."

recommendation.

The district court ruled against Maxwell on each point. The court credited the responding officers' concern for potentially wounded occupants and recognized that although the bullet holes were near the deadbolt, they may have struck a person answering the door. Further, it rejected Maxwell's argument that using the sledgehammer was an excessive means of entry, as he cited no cases supporting a sledgehammer's presumptive unreasonableness. The court also recognized the possibility that a wounded occupant could have hidden inside, meaning officers did not have to depart immediately upon entering, as Maxwell argued. The court concluded that "the officers limited their search to areas where an injured person in need of assistance may have been hiding."

Maxwell entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2) on the drug-related counts, preserving his objection to the suppression ruling. On the government's motion the court dismissed the felon-in-possession count. The court sentenced Maxwell to consecutive terms totaling 60 months and one day, with one day time served.

## II

When a district court denies a motion to suppress evidence, we review its legal conclusions de novo and its factual findings for clear error. *See United States v. Collins*, 59 F.4th 286, 291 (7th Cir. 2023).

The Fourth Amendment requires all searches to be reasonable. *See, e.g., Katz v. United States*, 389 U.S. 347, 353 (1967). Maxwell offers three arguments for why and how the officers acted unreasonably: First, they had no reason to believe

someone was injured inside his apartment and in need of aid. Second, it was unreasonable to use a sledgehammer to gain entry to his home. Third, any exigent circumstances evaporated when the officers first looked inside, or alternatively, once inside, the officers could not look beyond the immediate vicinity of the door.

**A**

Maxwell starts with his broadest attack: The police had no reasonable basis to believe that an occupant of his apartment was seriously injured, so their warrantless entry and search violated the Fourth Amendment.

The Fourth Amendment has indeed "drawn a firm line at the entrance to the house," and "[a]bsent exigent circumstances," a warrantless entry is unreasonable. *Payton v. New York*, 445 U.S. 573, 590 (1980). One such exigent circumstance justifying warrantless entry is the need "to render emergency assistance to an injured occupant." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). To enter a home on an exigency alone, police need an "objectively reasonable basis for believing," *Brigham City*, 547 U.S. at 406, that "someone is in need of aid and there is a compelling need to act," *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 564 (7th Cir. 2014).

To Maxwell, the police had no reasonable basis to believe someone was home and injured. First, he contends that many of the facts known to the responding officers negated the inference that someone was home. There was no response when the officers attempted to make contact with any occupants of Apartment 7 or as they entered. A neighbor called 9-1-1, and nobody mentioned seeing an occupant of that unit.

The emergency aid exception does not require injured occupants to call out for help. Indeed, this court has upheld entries where, like here, police heard only silence inside. *See, e.g.*, *United States v. Schmidt*, 700 F.3d 934, 936–37 (7th Cir. 2012) (search of backyard on emergency aid exigency was proper even where officer heard nothing in yard); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) (ruling that the emergency aid exception justified a warrantless search of an apartment even though officers could not hear noise inside). This court has signaled support for entries where silence supported the inference of an injured occupant. *See United States v. Venters*, 539 F.3d 801, 809 (7th Cir. 2008) (no noises from within shed consistent with possibility occupant was too injured to respond). Its novelty aside, Maxwell's approach might require police to abandon those too wounded to ask for help.

Second, Maxwell says the apparent intent of the shooters makes a wounded occupant unlikely. The two bullet holes in Apartment 7's door were about four centimeters apart, one slightly below the deadbolt locking mechanism and the other to its left. From this pattern, Maxwell discerns that the shooters intended not to injure an occupant but to disable the deadbolt and open the door.

Our concern, though, is about the bullet holes in the door. In *Schmidt*, for example, police knew nothing of the shooters' intent, including whether it was to harm the known victim, an occupant of the duplex, or some uninjured third party. This court focused on the likelihood that gunshot victims might be near bullet holes and shell casings. *See Schmidt*, 700 F.3d at 938. We follow the same approach here and focus on where the two bullets traveled—through Apartment 7's front

door.

Before deciding to enter the apartment, officers knew neighbors had heard gunshots in the building. The officers saw shell casings and a holster on the ground in front of the apartment. And most importantly, they saw bullet holes in the apartment door.

Though not identical, some of our past cases are similar. In *Schmidt*, police entered a duplex's backyard after hearing gunshots in the neighborhood, seeing bullet holes in the duplex, and seeing shell casings around the property. 700 F.3d at 936. The court held that "[t]hese circumstances, taken together" supported the inference that someone was injured in the backyard. *Id.* at 938; *see also id.* at 937–38. Indeed, "the officer … did not need to know that someone had actually been shot in order to go into the yard." *Id.* at 938.

In another case, police entered a woman's home without a warrant after she could not be located while experiencing a serious medical emergency. *Gaetjens v. City of Loves Park*, 4 F.4th 487, 490 (7th Cir. 2021). Sally Gaetjens's doctor had told her to check into a hospital after a checkup revealed she had high blood pressure. *Id.* Later that day, the doctor could not find her, so the doctor called her neighbor, Gaetjens's emergency contact. *Id.* After a fruitless search, the neighbor called the police. *Id.* When police arrived at Gaetjens's home, they "could not see anyone inside" and the neighbor told them "perhaps Gaetjens was at her other home." *Id.* Gaetjens had been in a hospital the whole time. *Id.* at 491.

We held that this search did not violate the Fourth Amendment. *Id.* at 493. Police knew nobody had heard from Gaetjens, her neighbor was concerned about a medical

emergency, and the mail and garbage at her house were piling up. It was therefore reasonable for police to believe she was inside, despite any evidence suggesting otherwise. *Id.* In other words, the police did not know where they might need to render emergency aid, but they believed help was needed somewhere.

Here, police knew that shots had been fired into Apartment 7, and they saw shell casings and a gun holster nearby. The bullet holes were in Maxwell's door, indicating to police that any victim would be inside the apartment. All of this warranted further inquiry into whether there might have been a gunshot victim somewhere behind the door. It thus was not unreasonable for the police to enter.

**B**

Maxwell turns next to how the officers chose to enter his home. He sees the manner of entry—forcefully beating down his door with a sledgehammer—as unreasonable given what he sees as weak evidence of exigent circumstances.

The officers' "manner of … entry" must be reasonable. *Brigham City*, 547 U.S. at 406. Police must comply with the knock-and-announce rule and not cause "[e]xcessive or unnecessary destruction of property" in due course. *United States v. Ramirez*, 523 U.S. 65, 71 (1998). *See Wilson v. Arkansas*, 514 U.S. 927, 929 (1995) (holding that part of the reasonableness inquiry for a search is whether police knock and announce their presence).

The police did not act excessively or unnecessarily when using the sledgehammer to breach Apartment 7's door. Police encounter many locked doors. If, as here, they have no key and manual force is futile, a sledgehammer or a battering ram

may be their only option. *See United States v. Singer*, 943 F.2d 758, 760, 764 (7th Cir. 1991) (officers used sledgehammer to enter home on no-knock warrant; evidence not suppressed); *United States v. Soria*, 965 F.2d 436, 439, 440 (7th Cir. 1992) (officers used sledgehammer to breach door after no responses to knocking; evidence not suppressed); *Heft v. Moore*, 351 F.3d 278, 280 (7th Cir. 2003) (police used a battering ram to enter a home); *Flournoy v. City of Chicago*, 829 F.3d 869, 873 (7th Cir. 2016) (same); *Taylor v. Hughes*, 26 F.4th 419, 424 (7th Cir. 2022) (same). This court has ruled that use of a battering ram was "gratuitous," *United States v. Jones*, 214 F.3d 836, 837 (7th Cir. 2000), but there the door was unlocked, and police opened it slightly before ramming it. Sometimes, as in *Gaetjens*, police have a key. 4 F.4th at 490. Sometimes, as in *Sutterfield*, they can enter with manual force. 751 F.3d at 547. And sometimes, as here, necessity commands a strong tool.

The officers also did not use the sledgehammer excessively or unnecessarily. One example of serious property damage during a search, albeit in a civil claim, is *Colbert v. City of Chicago*, 851 F.3d 649, 652 (7th Cir. 2017). Officers "pulled out insulation, put holes in the walls, ripped the couch open to search its contents, and tracked dog feces throughout the house." *Id.* (quotations omitted). Colbert brought a § 1983 claim but resolved it without reaching the Fourth Amendment issue. *Id*. at 658. Here, photographs of Apartment 7's door show the officers focused the sledgehammer's force on the part of the door most likely to be secure. Nothing indicates they tried to do anything more with the sledgehammer than open the door.

Maxwell takes a different tack. To him, our precedents and *Brigham City* require us to weigh the manner of entry against

how sure the officers are that an exigency exists. For this balancing test he cites *Brown*, but that case says something different: the reason for a search controls its breadth. *See* 64 F.3d at 1086. Inserting a key into a keyhole requires only a "slight justification," *id.*, because "[h]ow much cause agents need to do something depends on how deeply they invade the zone of privacy." *United States v. Concepcion*, 942 F.2d 1170, 1173 (7th Cir. 1991). Maxwell's argument is one we have resolved—the facts justified a warrantless entry.

Likewise, he erroneously claims *Brigham City* requires "just such an assessment." In that case the Court held that "[t]he manner of the officers' entry was also reasonable." 547 U.S. at 406. To the extent this refers to something other than the excessive and unnecessary standard we discussed above, it refers to the knock-and-announce rule. There, a police shout was the equivalent of a knock, which would have been lost in the "din" of the party. *Id.* at 406–07.

Consider the knock-and-announce rule. Police have long encountered locked doors. At the beginning of the seventeenth century, in fact, an English court articulated the knock-and-announce rule to prevent "the destruction or breaking of any house … by which great damage and inconvenience might ensue." *Wilson*, 514 U.S. at 935–36 (quoting Semayne's Case (1604) 77 Eng. Rep. 194, 196; 5 Co. Rep. 91 a, 92 a).

The police here complied with the rule. Barksdale testified that he and other responding officers attempted to make contact with the occupants before entry. The officers acted reasonably when they entered the apartment.

## C

Third, Maxwell argues the officers could not search the

entire apartment because either the exigency evaporated when they opened the door, or that exigency should have confined them to the area in front of the apartment door.

Once police are inside a home, the Fourth Amendment requires police to limit their search "'to the circumstances that justified it.'" *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (quoting *United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992)). Where the circumstance justifying entry is a need to render emergency aid, police can look only in "those places where an injured person might [be] found." *Arch*, 7 F.3d at 1304. Of course, officers do not have to avert their eyes from any evidence in plain view when they are looking in those places. *United States v. Gonzalez*, 555 F.3d 579, 582 (7th Cir. 2009).

The police were searching for persons who may be injured or in need of assistance. They looked for no more than 90 seconds. *See Salava*, 978 F.2d at 325 ("The ensuing search, which took approximately one minute and consisted of a brief check of the trailer for shooting victims, was appropriately limited to the circumstances that justified it."). They looked in two closets large enough to fit a person. Then they left. Given those events over that short time frame, the exigency did not evaporate when the officers opened the front door, and they appropriately tailored their search to that exigency.[2]

_____

[2] Body-camera video of the search shows police opening kitchen cabinets too small to conceal a wounded person. That footage was not admitted into evidence. Based on the briefs and oral argument before us, we understand that Barksdale's testimony at the suppression hearing conflicted with the body-camera footage as to the scope of the search. In the district court, Maxwell's trial counsel declined the government's offer to address Barksdale's testimony and to introduce the footage into evidence.

Maxwell notes that the police saw neither blood nor gun-shot victims inside his apartment. But, as Barksdale testified, gunshot victims do not always leave behind a large amount of blood. Further, a gunshot victim does not necessarily re-main where he was shot. Maxwell focuses on two possible scenarios, both of which were impossible, he says, because police did not find a gunshot victim or blood. A hypothetical victim would have remained on the floor in front of the door. Or, a hypothetical victim might have moved away from the door while bleeding so badly that he became unconscious and could not answer police knocks.

These are certainly possibilities. But it is just as possible a victim did not pass out and did not want to interact with po-lice. *Cf. Sutterfield*, 751 F.3d at 545, 546–47 (individual who had threatened suicide resisted officers' attempts to render aid). It is not unreasonable that a gunshot victim might want to evade both a shooter and police who might arrive soon.

Finally, Maxwell argues that the scope of the search was unreasonable. He contends that the only place officers were likely to find gunshot victims or evidence of them was in the immediate vicinity of the front door. Maxwell supports his view with *United States v. Brand*, in which the Fifth Circuit held that police could go no farther than the living room, where they found defendant unconscious. *See* 556 F.2d 1312, 1318 (5th Cir. 1977). *Brand* is correct—the exigency ended be-cause the officers found the victim. Here, the exigency did not end until police looked in the last area in which an injured person could have been found.

---

We confine our analysis to the record evidence. *United States v. McDonald*, 981 F.3d 579, 581 (7th Cir. 2020).

This case better resembles *United States v. Richardson*, 208 F.3d 626 (7th Cir. 2000). A 9-1-1 caller alerted police to an alleged murder victim that could be found in a basement of a duplex. Officers arrived and conducted a search of the entire house, finding nothing supporting the caller's claim. *Id.* at 627–28. This court approved such an expansive search because "it was objectively reasonable for the officers to conclude that the situation presented exigent circumstances" *Id.* at 631. There, like here, police had an objectively reasonable basis for believing someone needing medical attention was inside a home. And there, like here, they acted reasonably by searching wherever that person could be.

Police do not have to stop looking for wounded occupants just because they do not see blood or a body in one place. The officers here did not act unreasonably during their search of Maxwell's apartment.

### III

The Springfield police had an objectively reasonable basis for believing someone was inside Maxwell's home and in need of medical attention. They announced their presence before breaching the deadbolted door, and once inside they looked only in areas where an injured person in need of assistance may have been hiding. The search was reasonable under the Fourth Amendment and the district court properly admitted the evidence police obtained.

We therefore AFFIRM the district court's decision to deny Maxwell's motion to suppress.